Good afternoon, your honors. May it please the court. My name is Michele Prokofka for the appellant and cross appellee Alicia Dominguez-Castillo. For the ease of argument, I will refer to the appellant as Dominguez as she was in the district court opinion. May I please reserve three minutes for rebuttal? Thank you. The issue on appeal before your honors is a unique issue regarding the determination by the court of a child's habitual residence under the Hague Convention. Let me ask this in that regard and we've got the, I guess the land circuit case, Moses that says he can't have more than one habitual resident. But that was a situation where the countries involved were Israel and the United States and it makes some sense. Right. St. Martins and I've been there, I know Judge Fischer's been there. I can't imagine a place which more cries out for the striking down of artificial borders than St. Martins. Why didn't the district court get it exactly right and just say that it's such a small place, the border is so permeable, I say border in quotation marks, and when you're there you don't even know where you are. At least I didn't know where I was, but then there are those who would say, particularly Jack Milton, who would say there's nothing new about that, but they don't usually know where I am. But it is the place where the cultures are blended, there doesn't seem to be any real distinction between the Dutch side and the French side. I guess people who live there know what side they're on. And here you have living on one side, going to school on the other side. Why shouldn't we conclude that in this very unique circumstance, we can't have more than one habitual residence? Well, Your Honor, I believe that the bulk of the cases, including Moses, really determines habitual residence generally on the basis of where the child was allegedly wrongfully retained and where the child's habitual residence seems to be pretty clear was maybe prior to the alleged wrongful resident. Well, so the acculturation and the social, the formation of social relationships, those kinds of things that might go into domicile, although it's very difficult in domicile. But again, if you're crossing the street, say, to go to school, and you happen to cross the street and you're in a country that's governed by France, and when you come back for lunch at home, you're in a country that's governed by Dutch, then you go back over to France, then you come back to the Dutch side, it just seems like it's an artificial construct to say you've got to choose either French on the French side or on the Dutch side, when in reality, as the district court said, there's such a permeation of border here that it doesn't make any sense. Well, I think two things, Your Honor. Number one, there are still two separate countries. There's the Netherlands and there is the French West Indies. There's two sets of laws. There are two elections. There are separate elections that are held. The appellant here, Dominguez, she had work permits that were testified to at the time of the hearings only for the Dutch side of the island, and we had lease agreements that had been signed. So although there was lots of evidence that was presented that this was a permeable border and the parties did move back and forth freely for doctor's appointments, for schooling, for work, the fact of the matter is, the appellant only had the ability, because of the laws, to work on the Dutch side. All of the lease agreements for the family... I think we're looking at the kids' residence. Her relationships or the children's relationships? I'm sorry, Your Honor? You're looking at her relationships or the children's relationships? I think we look at, obviously, the shared intent of the parents as well as we focus on the children and their circumstances. And I think that every night they came back to the same location on the Dutch side of the island in the Netherlands. Every night they ate at home. The police when they were... They ate food? Yes, but... When the red man would eat Dutch food. And there were times that police were called and they were called to the residence on the Dutch side. In fact, because the appellant's work permit, Dominguez's work permit, was issued by the Dutch side, she was not allowed to work on the French side. So there are two separate countries. As a result, she never, or her children while residing with her, never subjected themselves to the law of the French side of the island, of the French West Indies. She really... She, the children, their circumstances were such that the Dutch West Indies... So in your view, the apartment on the French side wasn't occupied sufficiently for there to be the duality that the judge was alluding to? Yes, Your Honor. In fact, I believe there was testimony that perhaps only one or two nights over a period of years were even spent by the family in that location. I would note that Dominguez, the appellant in this case, didn't have any interest in any real estate on the French side of the island either. As a result, she never... She and the children really never subjected themselves to the French legal system from a residential standpoint. Is it the test, the legal system, or, I mean, from the explanatory report, which is not binding, I know, but the country where the child develops relationships, and that's where I focused earlier on the schooling, going to school on the French side. And I believe the youngest child may have, I think, had just started school. I believe the only testimony that was presented was with regard to schooling for the two younger children being on the French side, but that the older child, who was not a subject to this, who also lived with the family, attended school on the Dutch side. Right. That's AA, but AA is not involved. AA is not involved. But it shows that there are connections and there are circumstances with regard to this family that I think shows a shared intent to subject themselves to the legal system on the Dutch side. As a result, why shouldn't the status quo be maintained to allow the Hague Convention petition to be litigated in... Would the children have any intent to subject themselves to a certain sovereign? The kid goes to school where he or she goes to school. They don't really do that with their judge. I think I'll go to school over there because if I go to school over there, I'll be subjecting myself to the laws of France and their national anthem is a lot nicer than the national anthem. I mean, the kids, they go where the parent enrolls them in school, and that's where the relationships develop, and that's where the acculturation occurs, and that's what it seems to me, if we look at that in terms of the lens of the habitual relationship, it's either shared habitual relationship, or shared Dutch and France places, or it would just be France as opposed to where they came back and slept at night. What's wrong with that? Well, I think, Your Honor, one of the objectives of the Hague Convention is also to maintain the status quo, and if, in fact, the mother and the father, with regard at least to AA, had subjected themselves to the Dutch side of the island, that's where their residence was from 2008 through 2013, that's where they came home every night. The photos that were presented at the evidence, the majority of which were all of the activities were taking place on the Dutch side of the island with regard to family activities. So although I think we focus on the children and the circumstances, obviously we have to look at what was the shared idea or intent of the parties. So I think if we're also looking at status quo, my client resided, or the appellant resided in the Dutch side of the island, she should be able to avail herself to the avenues or the Hague Convention as applicable by the Dutch law. Counselor, do you acknowledge that there can ever be a case where there may be dual habitual residence? Yes, Your Honor, I do, and I believe that there are some cases that specifically indicate where you perhaps have orders where the parties share almost exactly equal amounts of time with the parties in two different locales. But that's like the Moses case where they're not living in the two jurisdictions simultaneously. They're in one jurisdiction six months a year and another jurisdiction six months a year. Yes. I'm talking about could there ever be, do you acknowledge that the law, it could be that under circumstances like this, you could be simultaneously a resident of two countries? I'm not sure that I can come up with a factual situation where that would be applicable, where we wouldn't also have to look at whether or not there's now been forum shopping, because I think that's also an objective of the nature of the case. Well, that's what you're alleging took place here. I am alleging that. They chose the French side for a more favorable court, but in reality, is there really a distinction? I mean, whether the custody proceeding took place on the French side or whether it took place on the Dutch side, for purposes of St. Martin custody law, is there really a distinction, at least a factual distinction, based on the residence and the domicile of the children? Your Honor, I'm not sure if there would be a difference from the custody perspective. When we get to the custody perspective, with regard to the law, but as far as Mr. Dedan's primary burden, he has to prove that he filed his application where the habitual residence of the children were, and the import of that decision is that that is the law that then would apply. And so, on that basis, I think that these decisions need to be carefully made. I think this is a very unique situation, a very unique set of facts, but I believe that from the shared intent of the parties and where they resided, and they subjected themselves to the law of their residence being Dutch law, that why wouldn't the Hague Convention allow her to, or the parties to, have access to the Dutch law for the Hague Convention? But maybe it would. Maybe it could have gone into place. That's what I was suggesting. Maybe it would. And I think my position is that his petition fails if he cannot prove that that was the habitual residence of the children immediately prior to the removal, wrongful removal or wrongful retention. I was confused about one thing. Maybe it's just nomenclature, but the Dutch side is a non-signatory to the Hague Convention. I believe they both are signatories to the Hague Convention. Are you sure about that? I thought, in fact, that Judge Conner may have actually indicated that as well in his opinion. I believe that they are. Well, let me see. What am I reading from? I'm reading from the Netherlands 2015 Human Rights Committee. Maybe it isn't as positive, but it says that the country, let me see now. Referring to the Netherlands, it says the country is a party to the 1980 Hague Convention on Civil Aspects of International Child Abduction, but the convention does not apply to Aruba, Siet Maarten, I'm not great on pronunciation, Siet Maarten and Curaçao. Let's assume for a moment that this is correct. That would change your view entirely because you've been operating under the notion that if the law, if Dutch law applies, that the Hague Convention would also apply. Well, I don't think that my argument would change because I still think we have to determine whether the habitual residence of the children was Siet Maarten, the French West Indies, and if it was not at the time of the wrongful removal or retention, then the application or petition fails. Okay. Thank you. Thank you. And we'll hear from you again. Good afternoon, Your Honours. May it please the Court. I am Anthony Vitrano, and I represent Maurice Didon, whom I have referred to in my briefs as father. If I may, I'd like to address the issue that was just left off, and that is this issue of habitual residence. The law is that if the determination of habitual residence is plausible in light of the record, then that determination cannot be reversed, even if this Court believed that it would weigh the evidence differently. And where's that coming from? That's from the Yang case.  Would you like the full citation, Your Honour? I've got it. Okay. Custody on the merits is decided by the Court. What definition of residence, of habitual residence, should we use? Should we use the straightforward definition of residence? What focus should we have on defining habitual residence? What is important here is the district court's determination that the habitual residence was two places, French St. Martin and Dutch St. Martin. The Moses case, as was mentioned, indicated that that finding is possible. But what is important in terms of these proceedings is that that determination, which is fact-intensive, is not subject to reversal if that determination was plausible in light of the record. And I think it's highly plausible, especially in light of the fact that what you have here is really, you have two places, but those two places compose one island. But when there's discussion of plausibility, isn't it, isn't the notion that if things are in equipoise or if they're close, you're not going to upset a decision either way, one country or the other, because it's that close. You're looking at different factors. You're looking at, you know, acclimatization. You're looking at, you know, exactly where the residence is. You're looking at several things. We've got one case that speaks of concurrent habitual residence. That's really it. Why should we affirm this when it seems like this is the outlier? That may be one way of describing it. It is true that this case is more of the exception than the norm. Usually there is one habitual residence. In this case, as I said, the district court found that there were two. And what is significant, again, for these proceedings, I don't mean to repeat myself, but I have to in this instance, is that that determination, that factual determination by the district court that there are two habitual residences, cannot be reversed if that finding is plausible in light of the record, and it is especially because both parties testified that the border between these two places was essentially evanescent, almost nonexistent. So even if this court felt that... Lots of people feel that way about Canada. I'm sorry? Lots of people feel that way about Canada. It used to be that way. So even if this court would take the same evidence and weigh it differently, it still could not reverse that determination as long as it were plausible in light of this record. Yeah, I'm looking at Yang. Now, it may come down, and I know you're arguing that you have to argue that the finding of the habitual residence is a finding of fact as opposed to a mixed question of fact and law, but to the extent that it is a mixed question, then what was said in Yang would not apply. That was said in terms of a finding of fact by the district court. It is a finding of fact. The finding of habitual residence is fact intensive. I think that was... It was fact intensive, correct. Right. But the fact that an inquiry is fact intensive does not necessarily mean that the end result of the inquiry is a finding of fact. It may be a mixed question of fact and law, or it could even be a pure question of law, but the inquiry of that question of law is fact intensive. The Fourth Amendment is a perfect example of that. It would not necessarily be a probable cause. It is a fact intensive inquiry, but the end result is a conclusion of law or a mixed law and fact. The end result has legal implications, but the court looks at the evidence to come to that conclusion. It looks at the evidence and determines, as it did in this case, what place or places are the habitual residences. What is significant in this case, what distinguishes this case, is that the court of the habitual residence, St. Martin, granted custody to Father Maurice Dudon exclusively. Exclusively. Is St. Martin signatory to the convention? French St. Martin is, yes. And Dutch? I believe that Dutch is also, but in this case, what is significant again is that the court in St. Martin, French St. Martin, is the one that determined that Father's custody rights are exclusive and made that determination on the merits. And both this court and the district court recognized that a determination of custody on the merits must be made by the court of the habitual residence. Now, you talked about the deference we owe if the finding was plausible. How can a district court be correct that there is no difference in French and the Dutch side when they have different governments, different laws, different legal systems, different currencies, and different languages, and different geographic boundaries? Isn't that clear air to have found that, that there are no differences in light of those differences that I just pointed out? The determination that's made is whether is the children's habitual residence. Yes, but the question that at least I'm focusing on is whether the determination that there could be a dual residence, a dual habitual residence in this case, is clearly erroneous when in fact the district court made a finding that there were no differences where in fact there are differences between the two countries. There may not be a border, but there are differences. This is not like crossing over the Pennsylvania border into Ohio. There's no question that there are differences between these two places. Indeed, they are parts of different sovereignties. That's not the question. The question is, are those two places habitual residences of these children? The question you have to answer, it seems to me, is whether or not the two places can be under the Hague Convention dual habitual residences. Most of them. At the same time. That determination, that is indeed the determination that the district court made in this case. The question being asked though, is that determination correct when the differences that Judge Fischer just laid out to you may not have been factored in or didn't appear in the court's analysis of different sovereigns, different laws? These children lived in those two places. That's essentially the determination. And the reason for that is... Because that's Moses. The fact that he lived in more than one place does not really help us. And if that's not the case, in all these cases they always live in more than one place or if there's never any case, the issue only comes up when the kid may be in more than one place. Then that's where we get to the habitual residence. If there's only one place that the kid lives in, it's easy. The district court has to determine, based upon the evidence, what the habitual residence is. What the children's habitual residence is. In this case, the district court determined, based upon the evidence, that there are two habitual residences. Can we get that? You're missing two points, okay? I'm sorry? One point is, you still haven't answered whether what's at issue here is a question of fact, on the one hand, or a question of law, or a mixed question of law and fact, on the other. That's one thing you haven't answered yet, right? The other thing you haven't answered is, why should we affirm the district court on its ruling of concurrent habitual residence, when the fact is that you haven't told us what test we should use. If we use a plain meaning test of residence, then the answer would be the Dutch side, because that's clearly where the kids live, because the apartment on the French side isn't used very often. If we use acclimatization, acclimatization and residence and the other factors, then you can argue it's a closer call, but at the end of the day, it comes down to residence. So there are several things you haven't answered. So if you may just take your time and answer them, they would be helpful to us. Okay. The first question, as I recall, you posed was, is the determination of habitual residence a factual determination or a legal determination? Or both, or mixed. Or mixed. It is a factual determination. The district court looks at the evidence, whatever it is, and comes to a conclusion and says the habitual residence is this country or these countries. For purposes of these proceedings, that factual determination by the district court cannot be reversed, as long as that determination is plausible in light of the record, the record that's established. I just pointed out six areas where the record was wrong. That has to factor into our analysis on plausibility. In addition, since you're talking about questions of fact or question of law, what about the question that they can be dual? It seems to me that that's clearly a legal determination. The conclusion that they, when you say dual, I believe you refer to that both can be habitual residences. Right. Okay. That conclusion that they can both be habitual residences is based upon the facts. It is. To follow up on the first question that Judge Greenway asked, is that a question of fact or a question of law? It is a question. It begins as a question of fact and it leads to a certain conclusion. A legal conclusion. A legal conclusion. Well. It's got to be a question of law, right? It's got to be. Judge Greenway had another question out there that he asked you. Okay, so we've established that the habitual residence issue is a question of law. I know you're arguing it's a question of fact, but I think it's clearly fact intensive, but the question is one of law that has to be resolved and the district court resolved it. Now, if you can answer the other question with regard to how we get there on habitual residence when it's clear that they lived on the Dutch side, what are the factors that we have to look at to come to a conclusion other than the habitual residences on the Dutch side? Well, the court looked at a number of things. It looked at where the children went to school, where they were treated by their doctors, where administrative things were done, where people worked, where they lived. It took all of those things into consideration. It took all of the evidence that was presented in terms of how these children, where they were, where they lived, where they were treated. And I think what is significant about this particular situation, as was noted at the outset of this argument, was that this is essentially one place. Are there two distinct countries? Yes, there are. But the border is almost, there's a border, but it's evanescent. People travel back and forth as this family and these children did. And it was largely those facts, indeed it was those facts, that led the district court to conclude in this case there are two habitual residences. What cases do you have that say that acclimatization, if I'm pronouncing it correctly, I hope I am, acclimatization is the key factor? Because what you're asking us to do is look at, you know, where they eat, where they go to school, and focus on that when, in fact, they're on the Dutch side. And I know ultimately you want us to confirm the concurrent habitual residence determination, but what I'm trying to figure out is how do we get to a concurrent when there's only one case out there and most of the cases look at residence, where are they living? I don't know of any case that cites a key fact or a determinative fact. What I see is that it is, these situations are fact intensive and are determined based upon the facts of each particular situation. There is no question that this is, as was the term used earlier, is more of an outlier, this is the exception. But the exception was recognized at least by one court, the Ninth Circuit, in the Moses case. That exception, that possibility was recognized. And the district court cited that case in sort of support of its own factual determination. This is a conclusion that the district court came to based upon the evidence presented by both sides. What is distinctive about this case is that we have a decision on custody on the merits by the court of the habitual residence, French St. Martin. And that is the entity that is supposed to make these decisions, not the district court. The district court decided, it did not honor that decision. Instead, it decided that mother, Alicia Castillo, should remain, one of the children should remain with the mother. In effect, that decision was a decision on custody. It ran counter to the decision by the court of French St. Martin. And because the district court did something it could not do in that instance, it acted without subject matter jurisdiction. In addition, it granted custody in effect to someone, the mother, who had no custody rights whatsoever. Indeed, she has had no custody rights since March of 2015. And that is because the court in the habitual residence awarded all the custody rights to the father, Maurice Didon. If the father has all the custody rights, and indeed if he has had them since March 2015, then these two children should be returned to father. Not necessarily because that is the habitual residence, but because father has the custody rights which are determined on the merits. Didn't the court merely just deny the petition as to J.D.? It said that J.D. should not be returned to father. So that didn't grant custody rights in denying that petition. That issue could still be determined in whichever court the parent or parents get to. He said under French law he waited too long to step forward, basically what the court said. I'm sorry. The court basically said under French law he waited too long to step forward. But that's not the same as the court awarding custody. No, what I'm saying is that the effect of what the district court did to not have one of the children returned to father, the effect of it was to grant custody of that child to mother. Well, if that's the argument, then there's no appeal of a ruling in that, because you can always make that argument. Then you come to the district court and say, well, you have to understand the district court has already awarded custody here. I'm not sure I follow where you're going with that. All right. These hate convention cases usually concern return of children to their habitual residence. And then once they're returned, the court in the habitual residence determines custody. This case is distinctive in that we already have a decision on the merits concerning custody. Well, that's, I think, where we disagree. Yes, I do. I don't think it's a decision on the merits on custody. I think this case will just decide where the custody determination is made. But if you're arguing that the application of French law in this case was such as to result in a custody determination, it lost me there. But you had a question? Yes. Earlier I asked you a question about whether Dutch St. Martin is a signatory to the hate convention. And you said that it was. What is your source for that, please? I believe the district court mentioned in a footnote, as I recall, that all three countries involved, French St. Martin, Dutch St. Martin, and the United States, were all signatories to the hate convention. I don't recall what footnote it is, but I believe that it did acknowledge that. Okay. Thank you. You're welcome. Thank you. Thank you, Mr. Vachon. And I believe he's here some time. Thank you very much. Did I say that correctly? Yes, sir. Okay. You're not dishumoring me, are you? I actually, I'll respond to paprika as well. Okay. Your Honor, I'd like to just make a couple of statements with regard to Attorney Vetrano's argument. I believe that the habitual residence discussion has to surround both fact, it's a mixed fact and legal argument. And I believe that was the case of Larby v. Larby, which was a 2012 case. And so, although we have a mixed fact and law question before the court, and we have all of these different factors that the district court did take into consideration, it's still a de novo or plenary review here, perhaps not of, you know, not of the facts that the court found credible, but of all of those facts that were presented at the time. And what is somewhat concerning is that the court relied upon really geography or a geographic area, the proximity of the parties to the boundary line between the two countries. And I believe that those are not factors that have been relied on in any of the cases when we're talking about making a determination regarding habitual residence. And I do think that that's important for the court to consider. I believe that also Attorney Vetrano is attempting to argue that somehow the district court made a custody determination. I disagree with that. I believe that the district court must, as one of the prongs of a Hague Convention determination, they have to determine whether or not the petitioner even had rights under the law of the child's habitual residence and whether or not they were rights of custody at the time, at the time or immediately prior to the wrongful retention or removal. Here it sounds as though the appellee is attempting to argue that a March 2015 custody order, which actually was obtained after the French Central Authority indicated he had no rights of custody, that somehow that can be retroactively applied to his Hague application, which was actually filed in December of 2014. Here there's been no evidence of record that shows that at the time of the wrongful retention that he actually had custodial rights to that child. And I believe the district court made the right determination. I have a question for you. If Dutch St. Martin is not a signatory to the Hague Convention, is there any circumstance in which we can do other than deny the petition? I don't believe so. I don't believe we get to the question of whether the actual habitual residence would be a signatory if we don't have. I don't think we can affirm a petition just because perhaps the proper habitual residence is not a signator. I would note that in taking this case on, I believe I reviewed the Department of State signatories list and I recall that both the Dutch Netherlands as well as the French West Indies were included on that list, Your Honor. Thank you. Thank you.